UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 23-cr-73-12 (CKK) |
| | : | |
| WAYNE CARR-MAIDEN | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to the top of the Guideline range and 5 years of Supervised Release.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

From beginning in or about January 2021 to June 1, 2023, Defendant Wayne Rodell Carr-Maiden conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl. The amount that was reasonably foreseeable to the Defendant was 4-12 kilograms. Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl from Southern California to destinations throughout the United States, including to the District of Columbia.

The Defendant entered into this conspiracy after he was introduced to a Los Angeles-based co-conspirator who was distributor of fentanyl-laced counterfeit oxycodone pills. The Defendant was introduced to the Los Angeles-based co-conspirator by a D.C.-based coconspirator of the Defendant's, along with one or more additional D.C.-based associates of the Defendant.

The Defendant's role in this conspiracy was to travel to Southern California in order to purchase fentanyl-laced counterfeit oxycodone pills from the Los Angeles-based coconspirator, and then bring those pills back to the District of Columbia. In performing these actions, the


Defendant worked at the direction of the same D.C.-based co-conspirator who introduced the Defendant to the Los Angeles fentanyl trafficker.

For example, the D.C.-based co-conspirator would book and/or pay for the Defendant's travel, pay for the fentanyl-laced counterfeit oxycodone pills from the Los Angeles-based codefendant in advance, and instruct the Defendant as to the appropriate methodology for smuggling or otherwise transporting the fentanyl-laced counterfeit oxycodone pills back to the District of Columbia.

Through these actions, the Defendant conspired with the Los Angeles-based co-conspirator to purchase bulk, distribution-level quantities of fentanyl-laced counterfeit oxycodone pills. The Defendant then conspired with his D.C.-based co-conspirator, along with others, to bring he pills back to the District of Columbia.

In transporting the pills back to the District of Columbia, the Defendant and his coconspirators utilized two primary methods: smuggling the pills while concealed in luggage and/or personal carry-on items, or alternatively, utilizing commercial mail carriers to ship the pills to the District of Columbia. The D.C.-based co-conspirator of the Defendant's, among others, often supplied the payments to the Los Angeles-based co-defendant for fentanyl-laced counterfeit oxycodone pills, which the Defendant then often traveled to Southern California to physically obtain from the Los Angeles-based co-conspirator.

For example, on September 7, 2022, the Defendant and his D.C.-based co-conspirator exchanged text messages, where the D.C.-based co-conspirator instructed the Defendant when to leave the District of Columbia, via flight, for Los Angeles. The D.C.-based coconspirator further instructed the Defendant when to return from Los Angeles and confirmed that he had already paid

the Los Angeles-based co-conspirator for the fentanyl pills that the Defendant was traveling to Los Angeles to obtain.

As another example of the D.C.-based co-conspirator instructing the Defendant's acquisition and subsequent smuggling of fentanyl pills from Los Angeles to the District of Columbia, on September 24, 2022, the D.C.-based co-conspirator instructed the Defendant to buy boxes of Nerds, M&Ms, and Skittles candies to smuggle fentanyl pills purchased in Los Angeles back to the District of Columbia.

Communications evidence, as well as physical seizures, indicate that the Defendant coordinated with the D.C.-based co-conspirator and others to bring tens of thousands of fentanyl-laced counterfeit oxycodone pills into the District of Columbia.

On January 5, 2024, the Defendant pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 40 Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl, which carries a five-year mandatory minimum sentence. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846.

**II.     LEGAL STANDARD**

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any

pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

### III.    ARGUMENT

A sentence at the top of the Guidelines in this case is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

#### 1.    The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 106,539 people in this country died of drug overdoses in the 12-month period ending in May 2023. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of October 1, 2023).[2]  Of these deaths, roughly 73,765 (or about 69 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By

---

[1] https://www.dea.gov/resources/facts-about-fentanyl
[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm

comparison, in 2021, 48,830 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *New Report Highlights U.S. 2021 Gun-Related Deaths: For Second Straight Year, U.S. Firearm Fatalities Reached Record Highs* (June 6, 2023)).³ And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2021, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—second among all the states and D.C. only to West Virginia. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2021 timeframe).⁴ Here, though, the Defendant was doing more than dealing fentanyl. He was dealing fentanyl that was disguised to look like legitimate oxycodone, which can fatally mislead users.

The seriousness of the Defendant's conduct merits the Government's requested sentence.

### 2. The Defendant's History and Characteristics

The Defendant, to his credit, has no criminal convictions. Moreover, he was previously in the U.S. Army and was apparently honorably discharged. *See* PSR, ¶ 130. He subsequently held other jobs, *see id.*, ¶¶ 127-28, indicating that he has an ability to make a law-abiding living via lawful means.

### 3. Other factors

Given the catastrophic impact of drugs on our community, a high sentence in this case is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is

---

³ https://publichealth.jhu.edu/2023/new-report-highlights-us-2021-gun-related-deaths-for-second-straight-year-us-firearm-fatalities-reached-record-highs
⁴ https://www.kff.org/other/state-indicator/opioid-overdose-death-rates/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Opioid%20Overdose%20Death%20Rate%20(Age-Adjusted)%22,%22sort%22:%22desc%22%7D

5

unacceptable. A sentence at the top of the Guideline range is designed to deter others from making the same choice the Defendant did. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

## V. CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to the top of the Guideline range, followed by 5 years of Supervised Release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By:   */s/ Solomon S. Eppel*
SOLOMON S. EPPEL
Assistant United States Attorney
DC Bar No. 1046323
601 D Street, NW
Washington, DC 20530
(202) 252-6661
solomon.eppel@usdoj.gov