## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Criminal No. 23-cr-73 (CKK) |
| | : |
| MARVIN ANTHONY BUSSIE (9), | : |
| | : |
| Defendant. | : |

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Marvin Anthony Bussie pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to the 120 months of imprisonment, followed by five years of Supervised Release.

### BACKGROUND

From on or about August 2020 to on or about April 4, 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug-controlled substance. The amount of said mixture and substance, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was 4-12 kilograms.

Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl from Southern California to destinations throughout the United States, including to the District of Columbia. He entered into this conspiracy after he was introduced to a Los Angeles-based drug trafficker, who was a distributor of fentanyl-laced counterfeit oxycodone pills. The Defendant was introduced to the Los-Angeles-based trafficker by D.C.-based co-conspirators of his, including individuals also charged in this criminal case.

The Defendant's role in this conspiracy was to travel to Southern California in order to purchase fentanyl-laced counterfeit oxycodone pills from the Los Angeles-based trafficker and then bring those pills back to the District of Columbia. The Defendant collaborated with D.C.-based co-conspirators of his. Ledgers and communications obtained over the course of the conspiracy further indicate that the Defendant worked in conjunction with his D.C.-based co-conspirators for the acquisition and redistribution of fentanyl-laced counterfeit oxycodone pills. For example, ledgers obtained from the Defendant's phone indicate that the Defendant and some co-defendants shared or otherwise owed each other pills and/or money in connection with fentanyl trafficking at various points during the conspiracy.

In transporting the pills back to the District of Columbia, the Defendant and his co-conspirators utilized two primary methods: smuggling the pills while concealed in luggage and/or personal carry-on items, or alternatively, utilizing commercial mail carriers to ship the pills to the District of Columbia. Through these actions, the Defendant conspired with the Los Angeles-based trafficker to purchase bulk, distribution-level quantities of fentanyl-laced counterfeit oxycodone pills. The Defendant then conspired with his D.C.-based co-conspirators to redistribute and sell fentanyl-laced counterfeit oxycodone pills in and around the District of Columbia for profit.

An example of these actions occurred on October 19, 2022. On that date, after meeting with the Los-Angeles-based trafficker in Los Angeles to purchase bulk quantities of fentanyl-laced counterfeit oxycodone pills, the Defendant attempted to fly from Los Angeles International Airport to Washington Dulles International Airport. In the Defendant's baggage was approximately 1.2 kilograms of fentanyl-laced counterfeit oxycodone pills, which were hidden in various candy boxes and packages. After the Defendant's baggage was flagged for secondary screening by Transportation

Security Administration officers at LAX, the Defendant fled, abandoning his narcotics, passport, and other personal items.

Egregiously, despite this encounter with law enforcement, the Defendant continued to traffic fentanyl. Instead, he simply shifted methodology for his importation of fentanyl pills into the District of Columbia. The Defendant collaborated with D.C.-based co-defendants smuggle fentanyl-laced counterfeit oxycodone pills back to the District of Columbia. Alternatively, the Defendant conspired with the Los-Angeles-based trafficker to ship packages containing pills to addresses in and around the District of Columbia.

For example, on October 28, 2022, the Defendant provided the Los-Angeles-based trafficker with a Waldorf, Maryland address of 2739 Hadley Drive to ship fentanyl-laced counterfeit oxycodone pills. Several days later, on November 8, 2022, FedEx flagged a package addressed to 2739 Hadley Drive as suspicious. A controlled delivery of the package was performed, and inside was a pair of shoes and approximately 600 grams of fentanyl-laced counterfeit oxycodone pills hidden in two separate baggies inside of the shoes.

In total, and prior to his arrest, communications evidence, as well as physical seizures, indicate that the Defendant coordinated with the Los-Angeles-based trafficker and his D.C.-based co-conspirators and others to bring hundreds of thousands of fentanyl-laced counterfeit oxycodone pills into the District of Columbia.

## STATUTORY PENALTIES

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi), and 846, the offense of conviction carries a mandatory minimum term of 10 years of imprisonment and a maximum term of life imprisonment, a fine not to exceed $10,000,000, and a term of supervised release of at least five years and up to life.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report [ECF No. 351] ("PSR") calculation that the Defendant is a zero-point offender, as that term is defined in Section 4C1.1 of the United States Sentencing Guidelines (the "Guidelines"). PSR at ¶ 91. The Government also concurs with the PSR that the Defendant's base offense level is 34, before any downward adjustments, and that the Defendant accepted responsibility early enough in the case so as to qualify for a three-point reduction to his offense level. PSR at ¶¶ 83, 89-90. Thus, based upon the final PSR released on May 31, 2024, the resultant total offense level of 29, along with a Criminal History Category of I, results in a corresponding range of imprisonment under the Guidelines of 87 months to 108 months, with a mandatory minimum of 120 months of imprisonment to be imposed.

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the

5

offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 120 months of imprisonment is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1.     The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 106,539 people in this country died of drug overdoses in the 12-month period ending in May 2023. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of October 1, 2023).[2] Of these deaths, roughly 73,765 (or about 69 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2021, 48,830 people in the United States died of firearms. *See* JHU

---

[1] https://www.dea.gov/resources/facts-about-fentanyl.
[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

Bloomberg School of Public Health, *New Report Highlights U.S. 2021 Gun-Related Deaths: For Second Straight Year, U.S. Firearm Fatalities Reached Record Highs* (June 6, 2023)).[3] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2021, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—second among all the states and D.C. only to West Virginia. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2021 timeframe).[4] Here, though, the Defendant was doing more than dealing fentanyl. He was dealing fentanyl that was disguised to look like legitimate oxycodone, which can fatally mislead users.

The seriousness of the Defendant's conduct merits the Government's requested sentence.

### 2. The Defendant's History and Characteristics

The Defendant, to his credit, has no criminal convictions. Moreover, since his arrest, he has obtained his general educational development certificate. *See* PSR, ¶ 123. The Defendant also has a fledging music career. *See id.*, ¶¶ 111, 128. While these facts raise questions as to why he decided to join a drug conspiracy, they also suggest that he has an ability to make a living through lawful means.

### 3. Other factors

Given the catastrophic impact of drugs on our community, a sentence of ten years imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable. A sentence that conforms to the mandatory minimum mandated by

---

[3] https://publichealth.jhu.edu/2023/new-report-highlights-us-2021-gun-related-deaths-for-second-straight-year-us-firearm-fatalities-reached-record-highs.
[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Opioid%20Overdose%20Death%20Rate%20(Age-Adjusted)%22,%22sort%22:%22desc%22%7D.

7

Congress is designed to deter others from making the same choice the Defendant did. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

## CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to ten years of imprisonment, followed by five years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: /s/ Matthew W. Kinskey
MATTHEW W. KINSKEY
SOLOMON S. EPPEL
Assistant United States Attorneys
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1046323 (Eppel)
United States Attorney's Office
Violence Reduction & Trafficking Offenses
601 D Street, NW
Washington, D.C. 20530