UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 23-cr-73 (CKK) |
| | : | |
| COLUMBIAN THOMAS (14), | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Columbian Thomas pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to 168 months of imprisonment, followed by five years of Supervised Release.

**Background**

From on or about August 2020 and continuing until the date of his arrest, June 2, 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug-controlled substance. The amount of said mixture and substance, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was 4-12 kilograms.

Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl from Southern California to destinations throughout the United States, including to the District of Columbia.

The Defendant entered into this conspiracy after he was introduced to a Los Angeles-based drug trafficker, co-defendant Hector David Valdez, who was a distributor of fentanyl-laced counterfeit oxycodone pills and a co-defendant in the Fourth Superseding Indictment. The

Defendant was introduced to Valdez by D.C.-based co-conspirators of his, including co-defendant Marvin Anthony Bussie.

The Defendant's role in this conspiracy was to travel to Southern California in order to purchase fentanyl-laced counterfeit oxycodone pills from Valdez and then bring those pills back to the District of Columbia. The Defendant collaborated with D.C.-based co-conspirators of his, including, but not limited to, co-defendants Bussie, Marcus Orlando Brown, Wayne Carr-Maiden, Melvin Edward Allen, Darius Quincy Hodges, and Andre Malik Edmond.

In transporting the pills back to the District of Columbia, the Defendant and his co-conspirators utilized two primary methods: smuggling the pills while concealed in luggage and/or personal carry-on items, or alternatively, utilizing commercial mail carriers to ship the pills to the District of Columbia.

In arranging his fentanyl-laced counterfeit oxycodone pills back to the District of Columbia, the Defendant typically negotiated with Valdez the price per pill to be paid in advance of the Defendant travelling to Los Angeles.

For example, on October 18, 2022, the Defendant flew to Los Angeles International Airport, where he was to meet Valdez at the airport. The Defendant negotiated a contemplated transaction in advance of arriving, telling Valdez that he would "shop with [Valdez]," and arranging a purchase price of $0.75 per pill as long as the Defendant purchased more than six "boats" of pills. The Defendant confirmed his purchase quantity, telling Valdez "bra I always get more den 6."

When the Defendant did not make his purchases in person in Southern California, he arranged for shipments of pills to D.C.-area residences. For example, on November 17, 2022, the Defendant provided Valdez with a District of Columbia address, 4908 Quarles Street NE, as well

as a recipient name, CJ Thomas, for Valdez to ship fentanyl-laced counterfeit oxycodone pills. Valdez complied, providing the Defendant with his CashApp handle for payment, to which the Defendant replied: "Imma Apple Pay." Valdez then sent the Defendant a picture of a shipment receipt to verify that the package of pills was en route to the 4908 Quarles Street NE address.

The Defendant also proudly boasted of the spoils of his drug trafficking. The below-pictured social media post shows the Defendant holding a large stack of U.S. currency, exclaiming "I [love] Cali!!!!"



On June 2, 2023, the date of his arrest, the Defendant was discovered in the bedroom of his residence. Located in the bedroom was a baggie containing approximately 100 blue M-30 fentanyl-laced counterfeit oxycodone pills, along with a loaded Glock 21 Gen4 handgun bearing serial number XUD296 and equipped with a machinegun conversion device. The Defendant

acknowledges possessing this firearm in connection with the drug conspiracy. Photos of the recoveries are below:




Communications evidence, as well as physical seizures, indicate that the Defendant coordinated with co-defendant Valdez and his D.C.-based co-conspirators and others to bring hundreds of thousands of fentanyl-laced counterfeit oxycodone pills into the District of Columbia for redistribution.

## Statutory Penalties

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi), and 846, the offense of conviction carries a mandatory minimum term of 10 years of imprisonment and a maximum term of life imprisonment, a fine not to exceed $10,000,000, and a term of supervised release of at least 5 years and up to life.

## Sentencing Guidelines

The Government concurs with the Pre-Sentence Report (ECF No. 456) that the applicable Guideline range in this case is 135 to 168 months. *See* PSR, ¶ 148.

**<u>Legal Principles</u>**

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial

Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## Argument

A sentence of 168 months of imprisonment is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1. The Nature, Circumstances, and Seriousness of the Offense

The count of conviction to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's

participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. Indeed, as emphasized repeatedly to the Court, the genesis for this wide-ranging investigation is the overdose death of a young woman in Southeast D.C. after her consumption of a single fentanyl-laced counterfeit oxycodone pill.

According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[2] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[3] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population*

---

[1] https://www.dea.gov/resources/facts-about-fentanyl.
[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[3] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

7

*(Age-Adjusted)* (2022 timeframe).[4] Here, though, the Defendant was doing more than dealing fentanyl. He was dealing fentanyl that was disguised to look like legitimate oxycodone, which can fatally mislead users.

Not content to merely sell potentially lethal drugs, the Defendant also possessed a handgun with a machinegun conversion device. As the Court is well aware, our community has recently faced staggering levels of gun violence. D.C. saw 274 homicides in 2023, the highest level in at least 20 years. See MPD, *District Crime Data at a Glance.*[5]  About 84 percent of the 203 homicides in 2022 involved the use of a firearm. See MPD, *Annual Report 2022*, 17.[6] Moreover, machineguns are generally less accurate and, therefore, pose a heightened and serious risk to bystanders. Ted Oberg, *'Incredibly serious': Deadly, unpredictable switches add to DC's gun toll; prosecutors seek change*, NBC4 Washington (November 29, 2023). The seriousness of the Defendant's conduct merits the Government's requested sentence.

## 2. The Defendant's History and Characteristics

The Defendant's participation in this conspiracy is not the only criminal activity in which the Defendant is believed to have been engaged. Before his arrest, the Defendant is believed to have been involved with a crew of individuals operating in the Paradise/Mayfair area of Washington, D.C.. This crew is known as the "Cruddy Gang," "Young Painters (YP)," and the "Cruddys." Each of these monikers are allusions to the Defendant's rap persona, "Cruddy Murda," as illustrated by the Defendant's publicly-advertised rap covers.

---

[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.
[5] https://mpdc.dc.gov/page/district-crime-data-glance.
[6] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2022_lowres.pdf.

8



The Cruddy Gang is believed to be connected to multiple acts of violence and beefs, or disputes, with other crews, drug dealing and weapons possession and use. As a rapper using the name "Cruddy Murda," the Defendant has hinted at this criminal activity in his music. For example, in the music video "Hunting" by Cruddy Murda and Sneaky Bandz, which was posted on YouTube on November 28, 2022, the Defendant stated, "I got a gun that'll clear out a crowd, nobody safe but the ladies and childs . . . I get out the car and I'm sending them shots . . . I gotta painter [i.e., a younger crew member] that just want to kill," and later, "creep through the cut and confirm me a kill, call out shit I be getting them wheels."[7] In other words, the Defendant purported to order or carry out murders and confirm his victim was dead. Similarly, in the music video "Maintenance," posted to YouTube on February 1, 2023, the Defendant stated, "I ain't the n**** to play with, I got some youngins thats geeking to spank shit."[8] In other words, the

---

[7] https://www.youtube.com/watch?v=tqyONQu_wRM.
[8] https://www.youtube.com/watch?v=q_3XBz8-sTw.

Defendant had at his disposal juveniles or young individuals ("youngins") who are available engage in acts of violence ("spank shit").

### 3. Other factors

Given the catastrophic impact of drugs and guns on our community, a sentence of 168 months imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable. A sentence that conforms to the recommended Guidelines range is designed to deter others from making the same choice the Defendant did. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

### Conclusion

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 168 months of imprisonment, followed by five years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: /s/ Solomon S. Eppel
SOLOMON S. EPPEL
MATTHEW W. KINSKEY
Assistant United States Attorneys
D.C. Bar No. 1046323 (Eppel)
D.C. Bar No. 1031975 (Kinskey)
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530