UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 23-cr-73 (CKK) |
| : | |
| RONTE RICARDO GREENE (16), : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Ronte Ricardo Greene pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 40 Grams or More of Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to 121 months of imprisonment, followed by four years of supervised release.

**BACKGROUND**

Beginning no later than February 2022 and continuing until his arrest in November 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug-controlled substance. The amount of said mixture and substance, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was 4-12 kilograms.

Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl-laced counterfeit oxycodone pills from Southern California to destinations throughout the United States, including to the District of Columbia. He entered into this conspiracy after he was introduced to a Los Angeles-based drug trafficker, Hector David Valdez, who was a distributor of fentanyl-laced counterfeit oxycodone pills.

The Defendant's role in this conspiracy was to travel to Los Angeles in order to purchase

fentanyl-laced counterfeit oxycodone pills from Valdez. The Defendant would then transport or have the pills transported back to the D.C. area. Communications between Valdez and the Defendant reference fentanyl-laced counterfeit oxycodone pills and indicate that the Defendant coordinated his purchases from Valdez in advance of traveling to Los Angeles. For example, on February 23, 2022, the Defendant texted Valdez that his bags were lost and that he was "leaving from Hollywood." Valdez then texted the Defendant an address in California, and the Defendant stated he would travel there. The Defendant also asked Valdez, "U was able to get them 10s," which is a term used interchangeably for 10 milligram oxycodone pills and the counterfeit variants thereof, to which Valdez responded that he would have them by the time the Defendant got there.

On June 17, 2022, Valdez asked the Defendant via Instagram message when the Defendant was "coming out here." The Defendant said, "Soons I get off da box" and "Ima have my lil joint try come out there for me." About three weeks later, Valdez again asked the Defendant when he was "coming out [here]" and explained that he had "a better ticket [i.e., price] on the smurfs [i.e., blue pills]."

Three months later, on September 15, 2022, Valdez asked the Defendant via Instagram messages, "how many you want." The Defendant responded, "7K," or 7,000 pills. The next day, the Defendant told Valdez he was on the flight and that he would "Land at 8." The Defendant told Valdez that he landed and which terminal he was exiting from. As the Defendant's business relationship with his supplier progressed, he began receiving more favorable price treatment. For example, on October 27, 2022, Valdez texted the Defendant, "Imma start giving them [i.e., pills] to you for 75 cents [each]" "Just keep getting 6 n up [i.e., 6,000 or more pills] fell me". About four days later, Valdez texted, "Imma start giving you the candles [i.e., pills] at 65 cents [. . .] cause you keep fucking with me pa."

2

Once the Defendant would return to the D.C. area, he sold those pills to others. For example, on November 5, 2022, a customer asked the Defendant if he has "light blues." Two days later, that same user wrote, "nd how many ercs [i.e., percs, or pain pills]] do u usually give for 100". The customer stated that one of their sources sold pills by the hundreds at a price of $8 per pill, while another sold pills at $7 per pill that are "real good," or high quality. In response, the Defendant stated that his pills were of equally high quality and agreed to sell 100 pills for $8 per pill (for a profit of more than $7 per pill). On January 29, 2023, a different customer asked Greene if there were "Any blues round." Greene agreed to sell that person 75 pills for $150.

It is hardly shocking, given these profit margins, that the Defendant regularly boasted of the money generated from his drug trafficking, an example of which is depicted below:



On November 15, 2023, Greene was arrested on the indictment in this case. Upon his arrest, he was found in possession of approximately 100 fentanyl-laced counterfeit oxycodone pills. He also had a fake driver's license with his picture but the name of co-conspirator Teron McNeil. When

questioned about the items, the Defendant claimed that the pills were for personal use, and then laughed, again exhibiting his flippant attitude regarding criminal conduct.



In total, and prior to his arrest, communications evidence, as well as physical seizures, indicate that the Defendant coordinated with the Valdez and his D.C.-based co-conspirators and others to bring thousands of fentanyl-laced counterfeit oxycodone pills into the District of Columbia.

## STATUTORY PENALTIES

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(vi), and 846, the offense of conviction carries a mandatory minimum term of five years of imprisonment and a maximum term of 40 years imprisonment, a fine not to exceed $5,000,000, and a term of supervised release of at least four years.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report [ECF No. 681] ("PSR") calculation that the Defendant's base offense level is 34, before any downward adjustments, and that the Defendant accepted responsibility early enough in the case so as to qualify for a three-point reduction

to his offense level. PSR at ¶¶ 108-110. Thus, based upon the final PSR released on April 4, 2025, the resultant total offense level of 31, along with a Criminal History Category of I, results in a corresponding range of imprisonment under the Guidelines of 108 months to 135 months, with a mandatory minimum of 60 months of imprisonment to be imposed as required by statute. Consistent with the terms of the parties' plea agreement, the Government has agreed to cap its allocution at the midpoint of the Defendant's applicable Guidelines range, which is 121 months. ECF No. 581, § 5.

## **LEGAL PRINCIPLES**

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a

district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 121 months of imprisonment is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect

6

for the law, and offer rehabilitation to the Defendant.

### 1. The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 79,526 people in this country died of drug overdoses in the 12-month period ending in December 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of May 4, 2025).[2] Of these deaths, roughly 47,861 (or about 60 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2021, 48,830 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *New Report Highlights U.S. 2021 Gun-Related Deaths: For Second Straight Year, U.S. Firearm Fatalities Reached Record Highs* (June 6, 2023)).[3] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all 50 states and the District. *See* KFF,

---

[1] https://www.dea.gov/resources/facts-about-fentanyl.
[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[3] https://publichealth.jhu.edu/2023/new-report-highlights-us-2021-gun-related-deaths-for-second-straight-year-us-firearm-fatalities-reached-record-highs.

7

*Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[4]

Here, though, the Defendant was doing more than conducting large-scale fentanyl transactions. He was purchasing bulk quantities of fentanyl-laced pills that were disguised to look like legitimate oxycodone for the purpose of redistribution to lower-level redistributors and end-users, which can fatally mislead the latter category of customer. The seriousness of the Defendant's conduct merits the Government's requested sentence.

    **2.    The Defendant's History and Characteristics**

The Defendant has only one prior felony conviction, though the admitted conduct during this prior incident is, unfortunately, indicative of the Defendant's recidivism. The Defendant was arrested on May 16, 2022, for possessing a loaded handgun and distribution or possession with intent to distribute a controlled substance that was a prescription drug. He was convicted of both and sentenced on March 24, 2023, to a mostly suspended sentence and three years of supervised probation. PSR at ¶ 114. In other words, he was arrested and convicted in a different jurisdiction while also participating in the conspiracy for which he is being sentenced by the Court—and was wholly undeterred from continuing to conspire to sell drugs. Indeed, on June 17, 2022, he told his fentanyl supplier Valdez that he would fly to Los Angeles when he was no longer on the "box"—demonstrating that his Maryland arrest, conviction and resulting supervision deterred him only insofar as he needed to wait to continue his drug trafficking until his court-ordered ankle monitor had been removed.

Moreover, although he was not discovered with a firearm at the time of his arrest, there is significant circumstantial evidence suggesting that the Defendant continued to possess firearms

---

[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates/

during his participation in this conspiracy, even after his felony conviction. To this end, the Defendant's Instagram returns include multiple photos of apparent firearms.

 

Indeed, the Defendant left no ambiguity as to his proclivity for firearms through his social media activity, posting the following photo of three Glock handguns, two of which appear to have extended magazines, along with an expression of his love for those firearms:



9

In sum, the Defendant was convicted of conduct in a different jurisdiction which mirrored the conduct for which he is presently facing sentencing. He received significance lenience from the prior sentencing court, serving mere days in prison and otherwise had his five-year prison sentence in that case suspended. The second chance offered by his previous sentencing judge did not open the Defendant's eyes; it merely emboldened him. This factor weighs in favor of a sentence at the midpoint of the Defendant's Guidelines range.

3. **Other factors**

Given the catastrophic impact of drugs on our community, a sentence of 121 months imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that peddling counterfeit pharmaceuticals to profit off their fellow community members' addiction is unacceptable. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

## CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 121 months of imprisonment, followed by four years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _/s/ Matthew W. Kinskey_
MATTHEW W. KINSKEY
Assistant United States Attorney
D.C. Bar No. 1031975
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530